USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 8/31/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

IVAN VALTCHEV,

Plaintiff,

-v-

THE CITY OF NEW YORK, THE NEW YORK CITY DEPARTMENT OF EDUCATION, THE HIGH SCHOOL OF GRAPHIC COMMUNICATION ARTS IN NEW YORK CITY,

Defendants.

------------------------------------X

**MEMORANDUM AND ORDER**

06 Civ. 7157 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ivan Valtchev brings this lawsuit against defendants the City of New York,[1] the New York City Department of Education and the High School of Graphic Communication Arts in New York City, alleging, inter alia, claims arising under: the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Defendants now move for

[1] In his opposition to the instant motion, plaintiff indicated that he wished to withdraw his claims against the City of New York. (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.") at 8 n.4.) That application is granted.

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Ultimately, plaintiff here has failed to identify any fact in the record sufficient for us to permit this case to progress beyond summary judgment. Although he asserts many claims, this case appears to amount to an unfortunate situation where a teacher was assigned to teach classes outside his desired field and then chose not to take the necessary steps to succeed in that assignment. Defendants have presented numerous performance evaluations conducted over the course of two years indicating that plaintiff was an objectively inadequate teacher when teaching a range of different subjects to special education students. Those evaluations indicate that plaintiff did not adopt preferred teaching techniques and did not adequately prepare for his classes, and that his students suffered as a result.

Plaintiff, on the other hand, has presented no evidence that would lead a reasonable juror to conclude that the adverse employment actions allegedly taken against him were motivated by discriminatory intent, or that defendants' proffered reason for those actions -- plaintiff's poor job performance -- was pretextual. Indeed, many of plaintiff's arguments are predicated on his admission that he was, in fact, unqualified to teach the classes to which he was assigned. Accordingly, and

because plaintiff has failed to demonstrate that there exists a genuine and triable issue of material fact in this case, defendants' motion for summary judgment is granted in its entirety.

## BACKGROUND[2]

Plaintiff is a white male of Bulgarian descent who was born on April 8, 1944. (DSF ¶ 3.) He is an accomplished artist and photographer with a master's degree in sculpture from the Royal Academy of Arts, Stockholm, Sweden, and has taught Fine Arts at numerous institutes of higher learning, including the National Academy of Design in New York and the University of Maryland. (Pl. Aff. ¶¶ 7-15.)

**Plaintiff is hired and placed in the resource room**

Plaintiff began his employment with the New York City Department of Education ("DOE") as a substitute teacher in 1990. (DSF ¶ 4.) In 1992, plaintiff began working as a special education teacher at the High School of Graphic Communication

---

[2] The following facts are drawn from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("DSF"), Plaintiff's Rule 56.1 Statement ("PSF"), the documents and deposition transcripts cited in support of those statements and the Affidavit of Plaintiff Ivan Valtchev ("Pl. Aff."). The parties' submissions in this matter were particularly voluminous and contained large amounts of extraneous information. Here, we attempt to set forth only the facts that are material to the instant motion and that took place during the legally relevant time period, as discussed in greater detail in Part II.

Arts ("GCA"). (Pl. Aff. ¶ 5.) He was certified by the state as a special education teacher in 1995. (DSF ¶ 8.)

Until 2005, plaintiff provided coverage for special and general education classes and taught classes in the "resource room" at GCA. (Pl. Aff. ¶¶ 26-27.) According to plaintiff,

> Resource Room teachers are special education teachers who do not have primary responsibility for delivering instruction in a core subject, rather they provide general assistance to students in their areas of weakness. This type of Resource Room is also referred to as "pull-out" special education teachers support services ("SETSS").

(Id. ¶ 27.)

**Plaintiff is transferred out of the resource room**

According to defendants, GCA's principal, Jerod Resnick, eventually concluded that "pull-out" resource rooms were ineffective and ended their use at GCA. (DSF ¶¶ 21-24.) Plaintiff contends that "pull-out" resource rooms were not eliminated. (PSF ¶ 24.) Irrespective of the ultimate fate of resource rooms at GCA, however, the parties agree that beginning in 2005, plaintiff was assigned to teach "self-contained" classes of special education students on particular academic subjects. (DSF ¶¶ 25-26; Pl. Aff. ¶ 50.)

Plaintiff asserts that he specifically requested that he not be assigned to teach math, and that he told Assistant

Principal of Special Education John Hartnett that he was not qualified to teach math outside of the resource room setting. (Pl. Aff. ¶ 51.) Nevertheless, plaintiff was assigned to teach self-contained math classes during the 2005-2006 school year, and during the 2006-2007 school year, plaintiff taught self-contained English, language arts and social studies/history classes. (Pl. Aff. ¶ 50.)

Apparently in response to this assignment -- after he voiced numerous objections directly to GCA administrators -- plaintiff filed a formal complaint with the DOE on March 9, 2007, wherein he described GCA as "an entire high school running under criminally/illegally appointed supervisors" and alleged "indisputable graft and outright mob dealings in the NYC Department of Education." (DSF ¶ 69; Declaration of Camille D. Barnett in Support of Defendants' Motion for Summary Judgment ("Barnett Decl.") Ex. BB at 1-2.) He further complained about GCA's shift away from using resource rooms for special education students and his being forced to teach math classes, despite the fact that he was "not qualified" to do so. (Id. Ex. BB at 3-4.)

In a letter dated May 7, 2007, the DOE responded to plaintiff that it had been "unable to find evidence of any violation of federal or State special education laws and regulations" during the course of its investigation prompted by his complaint. (Barnett Decl. Ex. CC at 1.) The DOE further

stated that all supervisors and special education teachers at GCA, including plaintiff, were appropriately certified for their assignments. (Id. at 2.)

**Plaintiff receives negative teaching evaluations**

During the 2005-2006 and 2006-2007 school years, GCA administrators observed plaintiff teach lessons at least seven times and rated plaintiff "unsatisfactory" on six of those occasions. (DSF ¶¶ 32, 35, 37, 41, 49, 51, 57.) Plaintiff was routinely criticized for failing to craft lesson plans for his math classes that were appropriate for special education students. (See, e.g., id. ¶¶ 33, 36.) Administrators also indicated in their evaluations that when teaching English and history classes, plaintiff failed to adequately involve the students, gave poor or unclear instructions, sometimes mispronounced and misspelled key words, and on occasion taught substantively incorrect facts. (See, e.g., id. ¶¶ 50, 53, 58.) Plaintiff also received "unsatisfactory" ratings on his annual performance reviews for both of those years. (Id. ¶¶ 39, 60.)

**Plaintiff's disciplinary proceedings**

In addition to receiving numerous unsatisfactory teaching evaluations, plaintiff was involved in several incidents arising from his conduct during this period:

- On April 13, 2007, a social worker at GCA filed a complaint against plaintiff, alleging that he "treated her in an 'unprofessional manner' by publicly, in a loud and rude manner, refusing her request to remain in his classroom to observe a student." (DSF ¶ 47.) In response, GCA administrators advised plaintiff "that in the future, such conversations were to be conducted in private, outside the presence of students and other staff members." (Id. ¶ 48.)[3]

- On May 22, 2007, plaintiff, Hartnett and plaintiff's union representative met to discuss allegations that plaintiff had drafted written statements describing his version of the incident involving the social worker and then had coerced his special education students into signing them. (DSF ¶ 55.) Following an investigation, Hartnett concluded that plaintiff had engaged in "unprofessional conduct," and plaintiff "was advised that if he required students to write statements in the future, that he first speak to his department supervisor and follow proper procedures." (Id. ¶¶ 55-56.)[4]

- On June 6, 2007, plaintiff, Hartnett and plaintiff's union representative met to discuss an alleged incident of plaintiff leaving his class to make a phone call to another school administrator. Plaintiff was advised that he should contact other staff members during non-teaching periods. (DSF ¶ 59.)[5]

---

[3] Plaintiff denies he acted unprofessionally in his interactions with the social worker. (Pl. Aff. ¶ 75.) He claims that the social worker's presence in his classroom was inappropriate because he was in the midst of the teacher union's Peer Intervention Program, pursuant to which he was not to be evaluated by school administrative personnel for a three-month period. (Id.) In addition, plaintiff contends that the social worker visited his classroom as part of a broader strategy of retaliation by the GCA administration for plaintiff's March 2007 complaint to the DOE. (Id.)

[4] Plaintiff denies coercing his students to write the statements and claims that the students later confirmed to administrators that he had not acted unprofessionally with the social worker. (Pl. Aff. ¶ 76.)

[5] Plaintiff contends that he was directed to call the administrator during that particular class period, and that he was out of the classroom for only a short time. (Pl. Aff. ¶ 81.)

On August 30, 2007, plaintiff was reassigned to the DOE's regional offices (sometimes called the "rubber room"), pending resolution of disciplinary charges brought against him alleging "incompetent and inefficient service, insubordination, conduct unbecoming his position or conduct prejudicial to the good order, efficiency or discipline of the services, and neglect of duty." (DSF ¶¶ 62, 64.) While assigned to the regional office, plaintiff receives his full salary. (Id. ¶ 63.)

**The instant litigation**

Plaintiff filed this lawsuit pro se on September 18, 2006 and on October 4, 2006 filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). After he retained counsel, he filed an amended complaint on September 13, 2007. The instant motion followed after more than a year of discovery, which itself produced numerous discovery disputes all resolved by this Court.

At oral argument on July 28, 2009, defendants' counsel represented to the Court that the DOE disciplinary charges against plaintiff are still pending, and that plaintiff's hearing would likely take place later this fall. (Oral Arg. Tr. at 2.) Also during oral argument, we asked plaintiff's counsel to identify which of plaintiff's many and varied claims they were actually seeking to press, and to provide specific record

cites in support of those claims because such support was wholly lacking in plaintiff's opposition papers.[6] When plaintiff's counsel was unable to do so for several of plaintiff's claims, we permitted plaintiff's counsel to submit a supplemental letter after the conclusion of oral argument.

On August 6, 2009, plaintiff's counsel submitted an additional 17-page letter ("8/6/09 Pl. Ltr.") indicating that plaintiff seeks to press his claims for "Disability Retaliation under the ADA"; "Age Discrimination under the ADEA"; "Age Retaliation under the ADEA"; "National Origin and Ethnicity Discrimination under Title VII"; "National Origin and Ethnicity Retaliation under Title VII"; "Gender Discrimination under Title VII"; and "Gender Retaliation under Title VII." For each claim, plaintiff included a virtually identical list of "adverse employment actions" occurring after December 2005.[7] That list of adverse employment actions comprised the following:

- In fall 2005, plaintiff was denied a promotion to Special Education Program Advisor. That position went to another teacher, whose self-contained math classes were then assigned to plaintiff.

[6] Notably, this request was necessary despite our having granted plaintiff's 11th-hour application to submit an opposition brief ten pages longer than is normally permitted under the Court's individual practices -- as well as a 69-page 56.1 statement and a 23-page supplemental plaintiff affidavit (along with other declarations and two volumes of exhibits).

[7] For the reasons set forth in Part II, we asked plaintiff to limit his supplemental briefing to that time period.

- In December 2005, plaintiff received an "unsatisfactory" teaching evaluation for a self-contained math class he taught.

- Also in December 2005, plaintiff was notified that he had not been selected to interview for the position of Assistant Principal of Special Education.

- In January 2006, plaintiff was denied a promotion to the position of Director of Photography at GCA, and that position was given to a 33-year-old male teacher.

- Also in January 2006, plaintiff indicated an interest in being selected as "Director of Photography Academy," but another teacher was selected for that position.

- In fall 2006, plaintiff "discovered" that a new, 26-year-old male teacher was appointed as "Coordinator of the Visual Arts Academy."

- On April 13, 2007, as discussed previously in greater detail, the social worker "appeared" in plaintiff's class and "announced she was there 'to observe what is wrong with this class.'"

- On May 3, 2007, plaintiff received an "unsatisfactory" rating for an English class he taught, and "Plaintiff was threatened with a [disciplinary] hearing and termination of his license."

- On May 18, 2007, plaintiff received an unsatisfactory rating for an English class he taught. The GCA administrator who prepared the evaluation also informed plaintiff that he was "aware" of a complaint plaintiff had made to the DOE in March and said "he was sure Plaintiff had no chance of winning as [DOE complaints] can 'drag on' as long as ten years and that plaintiff could not expect to remain in his position in the interim."

- On May 30, 2007, "Hartnett reprimanded plaintiff for 'unprofessional and coercive' behavior regarding students['] written statements regarding the social worker's April 2007 arrival although the students had corroborated Plaintiff's version of the events."

- On June 6, 2007, plaintiff received an unsatisfactory rating in a history class he taught.

- On June 22, 2007, "Hartnett reprimanded Plaintiff for 'an incident of unprofessional conduct' regarding a telephone conversation . . . during fifth period special education English class."

- On July 7, 2007, defendant prohibited plaintiff from teaching summer school, causing him to lose income for that summer.

- On August 23, 2007, plaintiff was notified that the DOE was bringing disciplinary charges against him, and that he had been assigned to DOE's regional offices while those charges were pending.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. Nat'l Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks omitted)). It is thus insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (internal citations and quotation marks omitted). Further, while credibility determinations, weighing evidence, and drawing legitimate inferences from facts are functions that the court must leave to the jury, if the nonmoving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary judgment is appropriate. See, e.g., Golden Pac. Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004). As we have previously observed, summary judgment is

available in discrimination cases as it is in other litigations. See Nieves v. Angelo, Gordon & Co., No. 05 Civ. 7782 (NRB), 2007 WL 1098710, at *3 (S.D.N.Y. Apr. 10, 2007) ("[S]ummary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation, and plaintiff must still offer concrete evidence from which a reasonable juror could return a verdict in her favor.") (internal citations and quotations omitted).

## II. Timeliness of Plaintiff's ADA, Title VII and ADEA Claims

Before reaching the merits of plaintiff's various claims, we first consider the issue of timeliness. The ADA, Title VII and the ADEA all require claimants to file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory or retaliatory act. See 42 U.S.C. § 12117(a) (ADA); 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1) (ADEA).

Here, plaintiff filed his EEOC complaint on October 4, 2006, meaning that events preceding December 8, 2005 (300 days earlier) would be time-barred. Plaintiff argues that the 300-day rule should not preclude us from considering an assortment of older incidents set forth in plaintiff's submissions because such incidents were part of a "continuous practice and policy of discrimination." (Opp. at 10.) However, the adverse employment

actions alleged here -- failures to promote, negative performance evaluations and refusals to provide opportunities to supplement income through summer school appointments, etc. -- are precisely the type of events that the Supreme Court has called "discrete acts" that trigger the 300-day clock. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112-14 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination . . . constitutes a separate . . . unlawful employment practice [and] [plaintiffs] can only file a charge to cover discrete acts that occurred within the appropriate time period.") As such, in considering plaintiff's ADA, Title VII and ADEA claims for purposes of this motion, we consider only events occurring after December 8, 2005.

**III. Disability Retaliation Under the ADA**

The ADA makes it unlawful for an employer "to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

To defeat a motion for summary judgment addressed to a claim of retaliation under the ADA, a plaintiff must first present sufficient evidence to make out a prima facie case -- that is, evidence sufficient to permit a rational trier of fact to find: (1) that he engaged in protected participation or opposition under the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001). If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. Cifra v. G.E. Co., 252 F.3d 205, 216 (2d. Cir. 2001).

Plaintiff's ADA retaliation claim here is novel, to say the least. He alleges "associational retaliation" -- that is, that school officials unlawfully retaliated against him after he notified them that he was not qualified to teach core academic

subjects to special education students outside of the resource room setting and that he believed his being assigned to teach those classes violated the No Child Left Behind Act of 2001 ("NCLB"). (Oral Arg. Tr. 5-7.) Specifically, plaintiff cites to four incidents that he alleges prompted the unlawful retaliation:

- In "November 2005 and afterwards . . . Plaintiff was involved in an internal grievance concerning his assignment to teach math classes, which he believed was intentionally designed to create an unsatisfactory performance record for him."

- On January 8, 2006, "Plaintiff's former attorney . . . wrote to Resnick contending that . . . Plaintiff unlawfully was assigned to teach math 'for the purpose of developing unjustified questions concerning his ability to teach . . . to prevent his opportunities for promotion [and] to create an unjustified record'" to support initiating disciplinary proceedings.

- In September and October 2006, plaintiff filed the instant lawsuit and his complaint with the EEOC.

- Plaintiff's March 2007 complaint to the DOE wherein he alleged that he was being assigned to teach classes for which he was not qualified.

(8/6/09 Pl. Ltr. at 4.)

Defendants argue, as a threshold matter, that plaintiff's assignment to teach self-contained classes was in compliance with the NCLB requirements. In support of this position, they cite to the findings from the DOE's investigation into plaintiff's March 2007 complaint, wherein the DOE concluded that "all supervisors and teachers of special education [at GCA],

including the complainant, are appropriately certified or licensed." (Barnett Decl. Ex. CC.) In addition, after oral argument (and at the Court's request), defendants submitted additional documentation confirming that it is the DOE's position that plaintiff is considered a "highly qualified" teacher under NCLB by virtue of the fact that he holds a permanent license in special education from the State of New York.[8]

Whether plaintiff's prior teaching assignments complied with the NCLB is ultimately irrelevant to our disposition of plaintiff's ADA retaliation claim, however, because we conclude that plaintiff has failed to identify any factual support in the record that would lead us to conclude that there exists a causal connection between plaintiff's numerous complaints to school officials[9] and the alleged adverse employment actions, or that

---

[8] Having reviewed the NCLB statutory language and defendants' supplemental submissions on this issue carefully, we frankly are uncertain whether plaintiff is -- as defendants contend -- effectively "grandfathered" in as a highly qualified special education teacher based on his pre-2004 special education certification. Indeed, the DOE's NCLB NYS Field Memo #03-2008 does seem to suggest that special education teachers must demonstrate "subject matter competency" through one of several mechanisms, such as by passing "content specialty tests" or the high objective uniform state standard of evaluation ("HOUSSE"), to be deemed "highly qualified" under NCLB, and it is undisputed that plaintiff has never done so. However, for the reasons set forth hereafter, we need not decide this question in addressing plaintiff's ADA retaliation claim.

[9] We also observe that plaintiff's complaints to GCA and DOE authorities seem to have stemmed more from self-interested concern about the impact his teaching assignments would have on his long-term employment prospects than about the adverse impact his teaching was having on his special education students. As plaintiff explained in his affidavit, "I believe Resnick and Hartnett forced . . . self-contained classes onto me so that they could use

would permit a reasonable factfinder to conclude that defendants' proffered explanation for the adverse employment actions -- plaintiff's poor job performance -- was merely pretextual.

On the contrary, plaintiff's evaluations from the 2005-2006 and 2006-2007 school years reflect numerous troubling deficiencies in plaintiff's teaching. For instance:

- During plaintiff's April 11, 2006 math class, for which he received an "unsatisfactory" review, the evaluator noted that plaintiff made numerous errors when writing on the board, and that plaintiff's lesson did not flow logically from one concept to the next and was "not at the appropriate level for special needs students." (Barnett Decl. Ex. J at 3-4.)

- During plaintiff's May 3, 2007 English class, for which he received an "unsatisfactory" review, the evaluator noted that out of the four students in the class, three "spent most of the lesson uninvolved in the instruction and uninterested in what was being taught." (Barnett Decl. Ex. O at 7.) The evaluation further indicates that plaintiff's instructions were unclear, prompting one student to say, "Translate to English" after plaintiff concluded. (Id. at 8.) The evaluation warned that "[i]t is of the utmost urgency that you improve in your classroom instruction and facilitate student learning." (Id. at 9.)

- During plaintiff's May 18, 2007 English Language Arts class, for which he received an "unsatisfactory" review, the evaluator noted that plaintiff's lesson contained misspelled words, mispronunciations and defined words incorrectly. (Barnett Decl. Ex. P at 5.) For example, plaintiff defined "orphanage" for his students as "kids with no parents." (Id.)

---

my lack of knowledge in the core academic subject areas as a basis for bringing disciplinary charges against me for pedagogical incompetency, leading to my dismissal and the termination of my teaching license." (Pl. Aff. ¶ 55.)

- During plaintiff's June 6, 2007 history class on Nelson Mandela, for which plaintiff received an "unsatisfactory" review, the evaluators noted that plaintiff's lesson plan was based on a biographical sketch of Mandela that plaintiff had taken from Wikipedia. (Barnett Decl. Ex. R at 1.) In addition, plaintiff, in referring to a political cartoon about Mandela during the lesson, pronounced the word "cartoon" as "carton," which confused the students. (Id. at 2.) He mispronounced the word "apartheid," and had a student mispronounce the word as well. (Id. at 3.) The evaluators also observed plaintiff giving the students incorrect substantive information during the course of the lesson. For example, when a student asked about the composition of the South African Government, plaintiff replied, "We have the same thing in New York City. We have the Congress, the Senate and then the New York Senate. You will see the same thing. We have blacks, whites, even Orientals, all represent you." (Id. at 5.)

Each of these evaluations concluded with extensive recommendations about how plaintiff could improve his teaching. However, the progressively worsening reviews indicate that plaintiff failed to take these recommended measures. This failure is further underscored by the fact that plaintiff was rated "unsatisfactory" in his year-end reviews for both the 2005-2006 and 2006-2007 school years. (See Barnett Decl. Exs. K, T.)

It is an affirmative part of plaintiff's case to concede that he was unqualified to teach the classes to which he was assigned during those years. (See, e.g., Pl. Aff. ¶¶ 52, 54-55.) And, indeed, he has offered no alternative explanation for his negative performance ratings except to say that he was being

singled out because of his complaints to GCA and DOE officials. On that point, we note that plaintiff's unsatisfactory teaching evaluations in December 2005 and April 2006, along with his unsatisfactory annual rating for the 2005-2006 school year, predate the filing of this lawsuit, the EEOC complaint and plaintiff's March 2007 complaint to the DOE. This sequence of events sharply undermines plaintiff's argument that his various complaints were the cause of his negative performance evaluations.

In sum, we are persuaded that there existed a valid, nondiscrimatory basis for the alleged adverse employment actions taken against plaintiff and that those actions were not part of an attempt by defendants to retaliate against plaintiff for his various complaints to school officials. Merely filing such complaints cannot shield one from the adverse consequences naturally arising from persistently poor job performance. As such, we find that plaintiff's ADA retaliation claim fails.[10]

[10] It is also worth noting that plaintiff cites (and we could find) no other case in which a teacher brought an "associational retaliation" claim under the ADA on behalf of his students for violations of NCLB. Accordingly, in dismissing this claim because of plaintiff's failure to adduce facts sufficient to survive summary judgment, we in no way hold that such a claim is legally sound. We likewise do not reach defendants' alternate argument that plaintiff's ADA claim is barred because he failed to raise it in his EEOC complaint.

**IV. Plaintiff's Discrimination and Retaliation Claims Under Title VII**

Plaintiff also alleges claims of "National Origin and Ethnicity" discrimination and retaliation, "Gender Discrimination" and "Gender Retaliation" under Title VII. The "ultimate issue" in any employment discrimination case is whether a plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," that is, whether there was discriminatory intent. See Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected class (2) with the qualifications for the position at issue (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. See id. at 802 & n.13; Gregory v. Daly, 243 F.3d 687, 695-96 (2d Cir. 2001).

If the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997); see also Reeves, 530 U.S. at 142-43. If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); see also James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). "The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason." Fields, 115 F.3d at 120-21; Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000)). To satisfy this burden, the plaintiff may rely on evidence presented to establish his prima facie case, as well as additional evidence, which may include direct or circumstantial evidence of discrimination. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101 (2003); Harris v. City of New York, No. 03 Civ. 6167(DLC), 2004 WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004).

It is not sufficient, however, for a plaintiff to show merely that he satisfies "McDonnell Douglas's minimal

requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." James, 233 F.3d at 153. Instead, the appropriate question is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue -- that is, whether the record contains sufficient evidence to support an inference of discrimination. See James, 233 F.3d at 154; Connell, 109 F. Supp. 2d at 207-08.

### A. National Origin and Ethnicity Claims

When asked at oral argument to identify any and all evidence in the record that would support plaintiff's claim of discrimination on the basis of his national origin and ethnicity, plaintiff's counsel cited to the following: (1) plaintiff's statement in his affidavit opposing summary judgment that Resnick told him in conjunction with his June 6, 2007 class evaluation that plaintiff's English was "not good enough because [plaintiff] learned it in another country" and that plaintiff "had to face the fact that people from [plaintiff's] part of the world have a problem in learning quality English as required in the school system." (Oral Arg. Tr. at 34 (citing Pl. Aff. ¶ 83)); (2) plaintiff's statement in his affidavit that he was told by another GCA administrator in conjunction with his April

11, 2006 class evaluation, "You have not realized that in this country we do teach differently. America is not Europe." (Oral Arg. Tr. at 37 (citing Pl. Aff. ¶ 70)); and (3) plaintiff's statement in his affidavit that at some time in the past, "students and staff members have painted a negative image of me based on my Eastern European origins. I have been called 'Russian spy' and 'KGB man'[11] even by my own colleagues and superiors." (Oral Arg. Tr. at 44 (citing Pl. Aff. ¶ 36)).[12]

Such "stray remarks" are far too vague and ambiguous to support a Title VII claim. See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."). Indeed, criticisms of plaintiff's accent and grammatical skills seem to be quite appropriate and well within bounds, given plaintiff's position as a teacher of English and language arts.

---

[11] Plaintiff's counsel also indicated during oral argument that Hartnett testified in his deposition that he believed plaintiff "was a Russian Jew," and then argued that this testimony somehow corroborated plaintiff's allegation that he had been called a "KGB man." (Oral Arg. Tr. at 44.) We disagree. There is nothing pejorative or actionable about incorrectly believing that someone is a Russian Jew, and such a misapprehension certainly does not -- in any way -- lead to the conclusion that people falsely claimed plaintiff was a member of the KGB.

[12] Plaintiff's counsel also cited to statements allegedly made by Hartnett in 2004, which are time-barred for the reasons set forth in Part II. We invited plaintiff's counsel to cite to any other portion of the record that they believed would support plaintiff's ethnicity and national origin discrimination claim in a supplemental submission to the Court following oral argument. Plaintiff's counsel provided no further record references in their August 6, 2009 letter.

Put simply, the circumstances here in no way give rise to an inference of discrimination on the basis of defendant's national origin and ethnicity. On the contrary, the record supports defendants' contention that the alleged adverse employment actions were taken against plaintiff on the basis of his poor job performance, and plaintiff has identified no evidence to indicate otherwise. We likewise reject plaintiff's national origin and ethnicity retaliation claim on the same basis.

**B. Gender Discrimination and Retaliation Claims**

Plaintiff also alleges that "Defendants engaged in gender discrimination or condoned a hostile work environment due to damage to Plaintiff's professional reputation even long after Plaintiff terminated his relationship with his former supervisor." (8/6/09 Pl. Ltr. at 13.) It appears this claim stems from plaintiff's allegations that he was sexually harassed by a former GCA administrator with whom plaintiff allegedly had a prior romantic relationship and who left the school in 2001. Despite plaintiff's suggestions to the contrary, such allegations pertaining to the relationship itself are clearly time-barred and not appropriately considered here.

In an effort to circumvent this time-bar problem and salvage his gender discrimination claim, plaintiff alternatively

alleges that later administrators discriminated against him during the relevant time period because they believed plaintiff was hired at GCA not because he was qualified, but by virtue of his prior relationship with the former GCA administrator. (Oral Arg. Tr. at 53.) Even assuming this were true, these allegations do not constitute a valid gender discrimination claim because plaintiff is not alleging discrimination based on his male gender, but based on the apparently popular perception at GCA that plaintiff was not qualified for his job. That perception, and any adverse employment action occurring as a result of it, are not actionable under Title VII.

We similarly reject plaintiff's "Gender Retaliation" claim. Once again, as with his other retaliation claims, plaintiff has failed to adduce any fact that would lead to the reasonable conclusion that the adverse employment actions plaintiff suffered here were anything other than the result of consistently poor job performance.

**V. Discrimination and Retaliation Claims Under the ADEA**

Plaintiff also alleges claims of discrimination and unlawful retaliation under the ADEA. These claims arise from essentially the same allegations as plaintiff's ADA and Title VII claims, and fail for effectively the same reasons.

As the Supreme Court recently held, a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. Gross v. FBL Financial Servs., Inc., 129 S. Ct. 2343, 2351-52 (2009). "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." Id. at 2352.

Here, plaintiff alleges that there was an "animus" against older teachers at GCA, and he claims that the alleged adverse employment actions taken against him were a result of discrimination based on his age. Specifically, plaintiff rests his ADEA claims on (1) a newspaper article from December 2005 reporting that the city teachers' union had accused the DOE of discriminating against teachers older than 40, (2) a newspaper article from October 2007 quoting Resnick as saying that GCA "needs young, energetic teachers," (3) plaintiff's assertion that a GCA administrator told him "that the DOE was implementing a policy of phasing out older teachers," and (4) affidavits from three other GCA teachers prepared in an entirely separate lawsuit in which plaintiff is not a party containing allegations of age discrimination at the school. (8/6/09 Pl. Ltr. at 6-7.)

This is not a sufficient evidentiary basis for plaintiff's ADEA claims to be permitted to proceed. Indeed, with discovery now complete, plaintiff is still relying on largely irrelevant newspaper articles, a stray remark from a school administrator, and affidavits from another lawsuit. Such a paltry showing at this late stage of the case is simply not enough for either plaintiff's substantive age discrimination or his retaliation claim to survive summary judgment, particularly in light of plaintiff's well-documented poor job performance.

## VI. Plaintiff's Remaining Claims[13]

### A. Section 1981 Claim

Plaintiff's amended complaint also alleged claims arising under § 1981. However, because plaintiff failed to provide any discussion articulating (or even pertaining to) his § 1981 claim in his opposition brief, we instructed plaintiff's counsel at oral argument to address that claim in plaintiff's supplemental submission if plaintiff intended to press it. (Oral Arg. Tr. at 67.) Plaintiff's supplemental submission contained no reference to this claim. It is therefore dismissed.[14]

---

[13] Plaintiff's August 6, 2009 letter did not address any of these claims. However, because they appear in plaintiff's amended complaint, we discuss them here in the interest of comprehensiveness.

[14] In addition, and as defense counsel noted during oral argument (Oral Arg. Tr. at 68), § 1981 does not prohibit discrimination based on national origin. See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987); Anderson

**B. Section 1983 Allegations**

Plaintiff also alleges that defendants violated his constitutional rights "under color of law in violation of § 1983." (Opp. at 29.) Specifically, in the words of plaintiff's opposition brief, "Plaintiff raised three underlying constitutional rights, to wit: an unlawful search and seizure under the Fourth Amendment of the U.S. Constitution; equal protection under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution; privacy, property, and liberty rights under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution." (Id.)

Plaintiff's counsel conceded during oral argument that his equal protection and due process allegations arising under § 1983 stem from the same "body of [f]acts and argument and so forth" as his discrimination claims. (Oral Arg. Tr. at 65.) As such, they fail for the reasons set forth previously.[15]

---

v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998). Whether plaintiff's ethnicity provides a sufficient basis for a § 1981 claim is not entirely clear. The fact that plaintiff is white suggests it does not, and, while we could locate no case where a Bulgarian plaintiff attempted to bring a claim under § 1981, at least one court has held that Ukrainians are not considered a race separate from that of the Caucasian race and do not have a cause of action under this section when alleging racial discrimination on part of other Caucasians. See Hiduchenko v. Minneapolis Med. and Diagnostic Center, Ltd., 467 F. Supp. 103, 106 (D. Minn. 1979). However, given that plaintiff has waived his § 1981 claim, we need not decide this question.

[15] In addition, to the extent that plaintiff is arguing that the "unsatisfactory" teaching evaluations he received were "stigmatizing," (see Opp. at 31 ("Here, it appears that there may have been some bad faith involved in the procurement of Plaintiff's U-ratings and ultimate transfer to

Turning to the alleged violation of plaintiff's Fourth Amendment rights, plaintiff asserts that in March 2004 he was the victim of an illegal search of his person and property by GCA's peace officer after a student accused plaintiff of having "misplaced" his Metro Card. (Oral Arg. Tr. at 70-71; March 20, 2008 Deposition of Ivan Valtchev ("Pl. Dep.") at 167; Pl. Aff. ¶ 47.) Specifically, plaintiff alleges that Hartnett instructed the officer to search plaintiff's bag to locate the missing pass, but subsequently located the pass on the floor of plaintiff's classroom. (Pl. Dep. at 169.)

To hold a municipal defendant (like DOE or GCA) liable under § 1983, a plaintiff must establish that the municipality itself deprived him of his constitutional rights through a "policy" or "custom." See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989); Monell v. Department of Soc. Servs., 436 U.S. 658 (1978); see also B.K. Solomon-Lufti v. New York City Department of Education, No. 05 Civ. 7260(GBD), 2006 WL 2664218, at *5 (S.D.N.Y. Sept. 13, 2006) (treating DOE as a municipal entity under Monell). A "[p]laintiff cannot infer a policy from the alleged violation of his own civil rights." Anderson v.

---

the rubber room.")), such an argument is, on its own, insufficient at the summary judgment stage. To establish that a liberty interest was affected by stigmatizing statements, a plaintiff must show that the allegation was stigmatizing "plus" he must show that the statements at issue were at least arguably false. See O'Neill v. City of Auburn, 23 F.3d 685, 691 (2d Cir. 1994). Even assuming plaintiff's negative reviews were stigmatizing, he has made no showing that they were false, particularly given his concessions about his incompetence to teach subject classes.

City of New York, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987). Here, plaintiff has provided no evidence of a concerted "policy" or "custom" by school officials to violate his Fourth Amendment rights. On the contrary, the alleged search was part of a single, isolated incident, and plaintiff alleges no further unlawful searches that would suggest the DOE or GCA had implemented an unlawful policy or custom of searching teachers.

Even were this not the case, plaintiff's Fourth Amendment claim would still fail, given that plaintiff has pointed to no evidence of injury arising from the search. The Supreme Court has held that compensatory damages for a constitutional violation under § 1983 must be based on the actual injuries suffered by the plaintiff. In cases involving a procedural due process claim and a First Amendment Claim, the Court ruled that when a § 1983 plaintiff suffers a violation of constitutional rights, but no actual injury, he is entitled to an award of only $1 in nominal damages. See Carey v. Piphus, 435 U.S. 247 (1978); Memphis Community School District v. Stachura, 477 U.S. 299 (1986).

Here, even assuming plaintiff had presented adequate factual support for his allegation that he had suffered a constitutional violation -- which he has not -- he has failed to present any evidentiary proof of injury. At worst, plaintiff suffered a brief search lasting minutes, if not seconds. The

record indicates students in the classroom were also searched. (Pl. Dep. at 170.) Such a minor indignity, although perhaps embarrassing, does not provide the basis for a federal lawsuit. Accordingly, defendants' motion for summary judgment as to plaintiff's § 1983 claims is granted.

**C. State and City Law Claims**

Finally, having concluded that defendants' motion for summary judgment as to all plaintiff's federal claims should be granted, we turn to plaintiff's remaining claims under the New York State Human Rights Law and the New York City Human Rights Law. These claims were not addressed substantively in the briefing on the instant motion. The parties' choice to focus on the federal claims here is understandable, however, since our analysis under the McDonnell Douglas framework also applies to claims under the New York State Human Rights Law the New York City Human Rights Law. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 707 (S.D.N.Y. 2003). Accordingly, those claims are dismissed for the same reasons we dismissed plaintiff's Title VII claims.

## VI. Plaintiff's Apparent Spoliation Motion

There remains one final issue: Plaintiff's opposition papers state, rather enigmatically, "The Court must grant Plaintiff's cross-motion for summary judgment due to Defendant's spoliation of evidence," and later states, "the Court should grant Plaintiff's cross-motion for spoliation." (Opp. at 6, 8.) It appears, therefore, that plaintiff may have been attempting to move for discovery sanctions against defendants, although plaintiff filed no notice of motion and failed to follow any of the pre-motion procedures set forth in the Court's individual practices.

This irregular procedural situation need not occupy us for long, however. Plaintiff has made no showing of spoliation, and despite plaintiff's suggestion that defendants have failed to meet their discovery obligations, the Court was extensively involved in the discovery process in this case and contemporaneously resolved each and every discovery issue. Discovery is complete, and plaintiff cannot now resurrect old disputes in a last-ditch effort to salvage his lawsuit. Accordingly, to the extent plaintiff has moved for a finding of spoliation, that motion is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety. The Clerk of Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

Dated: New York, New York
August 31, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Counsel for Plaintiff**
Nadira S. Stewart, Esq.
Charmaine M. Stewart, Esq.
Stewart Law Firm, LLP
133-40 Hook Creek Blvd.
Rosedale, New York 11422

**Counsel for Defendants**
Camille D. Barnett, Esq.
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007